**Edith HABERSTROH,**
**Plaintiff/Appellant,**

v.

**Gerald R. HABERSTROH,**
**Defendant/Appellee.**

**Civ. No. 9353.**

Supreme Court of North Dakota.

Oct. 12, 1977.

Nilles, Hansen, Selbo, Magill & Davies, Fargo, for plaintiff and appellant; argued by John E. Rowell, Fargo.

Lanier, Knox & Olson, Fargo, for defendant and appellee; argued by P. W. Lanier, Jr., Fargo.

PAULSON, Judge.

This is an appeal by the plaintiff, Edith Haberstroh [hereinafter Edith], from the judgment of the Cass County District Court entered on January 25, 1977, in which judgment the court granted a divorce to Edith from the defendant, Gerald Haberstroh [hereinafter Gerald], on the ground of Gerald's extreme cruelty, and granted a divorce to Gerald from Edith on the ground of Edith's habitual intemperance. The court also awarded Gerald custody of their five minor children; awarded Edith alimony, medical payments, and attorneys' fees; and made a division of the property. Edith appeals from that portion of the judgment in which the court divided the property and awarded Edith alimony and attorneys' fees.

Gerald and Edith were married in North Dakota on February 24, 1958, at which time they were both seventeen years old, and Edith was pregnant with their first child. They commenced their marriage with very little property or finances. Edith completed the first half of her junior year in high school prior to her marriage to Gerald, and she has acquired no additional formal edu-

cation. Gerald, after marrying Edith, graduated from high school. For a short time Gerald and Edith lived in Fargo, where Edith was employed as a waitress, while Gerald attended Hanson Trade School. Thereafter, they moved to a farm near Rolla, where Gerald has continued to farm successfully ever since.

Gerald and Edith have five children whose names and ages at the time of the trial were as follows: Kirk, age 17; Michael, age 16; Terry, age 14; Chad, age 13; and Lori, age 9. All five children, as of the trial date, were living on the Rolla farm. Although Edith requested custody of their daughter, Lori, the trial court awarded custody of all of the children, including Lori, to Gerald, and Edith did not appeal the trial court's decision in this regard.

During the course of their marriage, Gerald was continuously preoccupied with managing the farm operation, and Edith testified she felt like a neglected maid. Commencing in the early years of the marriage, Edith would leave the young children with neighbors or friends and absent herself from the farm, without Gerald's knowledge or consent, for a day at a time or longer. This would occur as often as two or three times every two weeks. Edith testified that she would leave home to visit relatives, and she also conceded that on some occasions she went curling and stayed late or overnight drinking beer. When Edith returned home from these absences, Gerald pleaded with her to desist from leaving the home and the children but his pleadings were to no avail. Gerald would sometimes lose his temper as a result of Edith's repeated absences from home. Gerald conceded that on twenty or thirty occasions during their marriage he physically assaulted and verbally abused Edith.

During the later years of the marriage, Edith developed a drinking problem which was aggravated by her emotional upset as the result of an automobile accident in which their son, Kirk, was seriously injured. This drinking problem of Edith's culminated in her being hospitalized twice—once in October of 1973, and again in November of

1974—with a diagnosis of depressive neurosis, schizoid personality, and schizophrenia with some paranoid features. Edith has also been diagnosed by her doctors as having cirrhosis of the liver. Her psychiatrist, Dr. Jerome P. Hager, N.D., testified, through his deposition, that Edith will need continued psychiatric care as well as physical treatment in the future. He further testified that as a long-term treatment program, Edith should join Alcoholics Anonymous; obtain a part-time job to keep herself occupied; and, as part of such long-term treatment, Edith should also receive some financial payments to supplement her income and to provide her with financial security. Dr. Hager also testified that Edith could not manage a large amount of money and that any financial award to Edith should be on a monthly basis and "monitored so that she does not spend money unnecessarily". This testimony was not refuted.

Edith has resided in Fargo since her first hospitalization in October of 1973. Prior to the divorce, she made a few brief visits to the Rolla farm, but she refused to return to live with Gerald. Edith accepted a job in a Fargo bar, and met a male friend while working there. In December of 1975 this male friend of Edith's moved from his Fargo apartment and commenced living with his parents in order that Edith could reside in his apartment. He visited Edith almost daily, staying late at night, and, on occasion, he stayed there overnight. Nevertheless, Edith and her male friend both deny that they have ever had sexual relations. Since January of 1974 Gerald has sent Edith $400.00 per month for her living expenses in Fargo.

Gerald's net worth, accumulated subsequent to his marriage to Edith, as a result of his successful farming operations, ranges between $325,000.00 and $482,000.00, according to the evidence admitted at the trial.

Gerald has an ownership interest in 1540 acres of farmland of which approximately 1000 acres are tillable. Gerald and Edith own 160 of these 1540 acres in joint tenancy, which 160-acre tract is unencumbered. In 1976 Gerald purchased 920 of these 1540 acres on a contract for deed at an acquisition cost of $200,000.00. He acquired 160 of these 920 acres at an acquisition cost of $48,000.00, on which he made a downpayment of $13,920.00, and he will make monthly payments of $1,704.00, plus 7% interest on the unpaid balance until the $48,-000.00 is fully paid. He acquired 760 of these 920 acres at an acquisition cost of $152,000.00, on which he made a downpayment of $44,080.00, and he will make annual payments of $5,396.00, plus 7% interest on the unpaid balance until the $152,000.00 is fully paid. Gerald borrowed $50,000.00 from a bank to make the downpayments on the 920-acre land acquisitions, and he pledged, as security for the loan, all of his certificates of deposit, held both in his name and in the names of those members of his immediate family, in the amount of $48,-800.58 plus accumulated interest. Gerald has also rented, over the past years, twenty-one quarters of land on a crop-share basis. The house and other farm buildings are situated on the rented land. Gerald has an extensive line of farm machinery and equipment which he estimated to be worth $139,600.00. Gerald also has $2,400.00 in a checking account.

Gerald's annual adjusted gross income during the later years of the marriage was as follows: $46,027.00 in 1973; $88,794.00 in 1974; and $77,581.00 in 1975. However, Gerald testified that he anticipated he would incur a net loss in 1976. Gerald estimated his unpaid farming expenses for the 1976 crop season (including fuel, seed, repairs, and custom combining) would be approximately $12,800.00. Gerald's only other unpaid debt is in the amount of $8,254.13 owed to Commodity Credit Corporation. Gerald also estimated that his expenses to plant the 1977 crop would be approximately $50,000.00.

The trial court divided the property between Gerald and Edith as follows:

1. The quarter section of land in Towner County shall remain in the names of Gerald and Edith as joint tenants,

and the net income derived therefrom shall be divided equally between Edith and Gerald;

2. Edith shall have the 1973 Mercury automobile;

3. The certificate of deposit in the sum of $2,304.58 held in the joint names of Edith and Gerald shall be divided equally between them;

4. Gerald shall keep and maintain in full force Insurance Policy No. 94152 dated August 6, 1975, by the American Life and Casualty Company on the life of Gerald, of the face value of $3,920.00, in which policy Edith is named as beneficiary; and

5. Gerald shall keep and retain as his own all other land in his name or in which he has an interest, together with all livestock, farm machinery and equipment, motor vehicles, grain on hand and in storage, and all cash assets now in his possession or control.

In addition to dividing the property, the trial court awarded to Edith the following:

1. Alimony in the amount of $600.00 per month until the further order of the court or until Edith remarries or until Gerald's death;

2. All necessary doctor, hospital and medical bills incurred by Edith until she remarries or until Gerald's death;

3. The sum of $1,500.00 for attorneys' fees; and

4. The sum of $880.66 for costs advanced by Edith's attorneys on her behalf.

Edith now appeals from the trial court's judgment asserting that the trial court's division of the property, the award of $600.00 per month as alimony, and the award of $1,500.00 for attorneys' fees is inequitable. Edith requests this court to equally divide the real and personal property between her and Gerald; to award her $1,200.00 per month as alimony; and to award her $4,412.00 for attorneys' fees incurred at the trial level. Edith has not requested an award of attorneys' fees for this appeal.

Section 14–05–24 of the North Dakota Century Code provides:

"*Permanent alimony—Division of Property.*—When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

■ Under § 14–05–24, N.D.C.C., the district court may consider, in determining the division of property or in determining whether either party is entitled to alimony, the respective ages of the parties to the marriage, their earning abilities, the duration of and the conduct of each during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at that time, its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage, and such other matters as may be material. *Bohnenkamp v. Bohnenkamp,* 253 N.W.2d 439 (N.D.1977); *Hegge v. Hegge,* 236 N.W.2d 910 (N.D.1975); *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966).

■ The findings of fact upon which the district court's determination of alimony and property division in a divorce action is based will not be set aside on appeal unless they are clearly erroneous pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure. The determinations will not be disturbed unless they are induced by an erroneous view of the law. *Rambel v. Rambel,* 248 N.W.2d 856 (N.D.1977); *Fine v. Fine,* 248 N.W.2d 838 (N.D.1976); *Bellon v. Bellon,* 213 N.W.2d 376 (N.D.1973). A finding is "clearly erroneous" only when,

although there is some evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Kostelecky v. Kostelecky,* 251 N.W.2d 400 (N.D.1977). The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court. *Larson v. Larson,* 234 N.W.2d 861 (N.D.1975).

## PROPERTY DIVISION

■ In the instant case, Edith received less than one-half the value of the property as divided by the district court, and, on this appeal, she requests this court to equally divide the property between her and Gerald. However, this court has stated that a division of the property does not have to be equal in order to be equitable. *Rohde v. Rohde,* 154 N.W.2d 385, 390 (N.D.1967).

Edith received a joint tenancy interest in a quarter section of unencumbered land, the 1973 Mercury automobile, a one-half interest in a $2,304.58 certificate of deposit, and the beneficial interest in a life insurance policy on Gerald's life. Gerald was awarded all of the real estate and all other personal property, which included all cash assets in his possession or control. Gerald did receive more than a one-half share of the property. However, it is significant, in this regard, that Gerald has financial obligations toward others, while Edith has no such obligations. Gerald has custody of the five children, all of whom live at home on the Rolla farm. Consequently, he has all of the parental responsibilities and financial obligations involved in raising five children. Gerald has the further financial obligation of providing alimony to Edith of $600.00 per month, in addition to paying all of her future doctor, hospital, and medical bills. The medical payments could amount to a considerable sum in view of Edith's past medical history and the testimony of her psychiatrist that Edith will need continued psychiatric care, as well as physical treatment in the future.

We must recognize that the record further reflects that the farmland held by Gerald, in particular the 920 acres purchased in 1976, is heavily encumbered. Gerald's farmland is the basic resource from which he must earn sufficient income to make purchase payments for the land itself, in addition to providing for himself and five children, and providing the court-ordered alimony and medical payments to Edith. This court is not left with a firm conviction that the trial court made a mistake in its division of the property. We therefore hold that the district court's division of the property is not clearly erroneous, and is, accordingly, affirmed.

## ALIMONY AWARD

■ Edith asserts that the district court's award of alimony is inequitable and she requests this court to award her alimony of $1,200.00 per month. In addition to the property division, Edith was awarded alimony of $600.00 per month, plus all necessary doctor, hospital, and medical expenses until she remarries or until Gerald's death. Edith will also receive one-half of the net income from the jointly held quarter section of farmland. Since January of 1974, and prior to the divorce, Gerald was sending Edith $400.00 per month for her living expenses in Fargo. Consequently, Edith's income status was improved substantially by the district court's alimony award. The joint tax returns of Gerald and Edith reflect that Gerald's annual adjusted gross income was $46,027.00 in 1973; $88,794.00 in 1974; and $77,581.00 in 1975. The district court concluded that the tax returns for the later years "show the result of [Gerald's] concentrated labor and effort". There is substantial evidence in the record to support the district court's conclusion. Since October of 1973 Edith has refused to return to the Rolla farm and live with Gerald. Consequently, she did not contribute to any property or income accumulation during that time. The evidence further reflects that Gerald farmed twenty-one quarters of land under lease, in addition to farming his own farmland. As a result of his own ambition and labor directed toward farming this leased land, Gerald undoubtedly in-

creased his net income substantially. However, there is no certainty that Gerald will be allowed to lease this land in the future, and if in future years he is unable to do so his potential earning capability will be diminished significantly.

We hold that the district court's award of alimony is not clearly erroneous, and it is, accordingly, affirmed.

## ATTORNEYS' FEES

█ The district court awarded Edith the sum of $1,500.00 for her attorneys' fees and, in addition, awarded her the sum of $880.66 for costs advanced by her attorneys on her behalf. Edith asserts that the district court's award of $1,500.00 for attorneys' fees is unreasonable and constitutes an abuse of discretion, and she requests this court to increase such award of attorneys' fees to $4,412.00.

█ The allowance of attorneys' fees in a divorce action is within the discretion of the district court, pursuant to § 14–05–23, N.D. C.C. The district court's decision will not be interfered with by this court unless it is affirmatively established that the district court has abused its discretion. *Bohnenkamp v. Bohnenkamp,* 253 N.W.2d 439 (N.D.1977); *Halla v. Halla,* 200 N.W.2d 271 (N.D.1972). Edith has failed to establish that the district court's award of attorneys' fees is so inadequate that it constitutes an abuse of discretion by the district court. Accordingly, the request for an increased award of attorneys' fees is denied, and the district court's award to Edith of $1,500.00 for attorneys' fees is affirmed.

In accordance with this opinion, the judgment of the district court is in all things affirmed.

ERICKSTAD, C. J., and PEDERSON and SAND, JJ., concur.

VOGEL, Justice, dissenting.

I dissent, for reasons stated in *Haugeberg v. Haugeberg,* 258 N.W.2d 657 (N.D.1977). Without repeating what I said there, I would like to point out what the Court is doing in this case.

Without saying that it is considering the relative fault of the parties, the majority opinion seems to blame the wife for the separation, which occurred in 1973. The cause of this separation may be the wife's drinking, or it may be the husband's brutality and indifference to her. I cannot say which is cause and which is effect, or whether causes and effects are mixed.

At the time of the separation, the husband's income was $46,000 per year. At the time of trial, his admitted net worth was either $325,000 or $482,000, depending upon which of his admissions is taken to be accurate.

As a reward for 15 years of marriage and raising five children, and helping accumulate about one-third of a million dollars of marital estate, the wife is to be given only an undivided half-interest in one quarter of land worth perhaps $24,000 [as the husband testified, the average value of all the land was $300 per acre], a half-interest in a certificate of deposit for $2,304.58, $600 per month alimony, and payment of her medical bills!

Of course, if she dies first, her heirs will lose all interest in the jointly owned property and the alimony will end. If he dies first, the alimony and the payment of medical expenses will end, and she will get the jointly owned quarter-section and certificate of deposit.

During the time they are both alive, she will get $600 per month, which is approximately 10 percent of his average income for the years 1973–1975, or, otherwise stated, the amount which could be earned at six percent on an investment of $120,000, with ownership of the principal remaining in him. An annuity, of course, would cost less.

To describe this as "equitable" is to give that word a new meaning.

If Mrs. Haberstroh is a sick woman, she should not be penalized. If she cannot handle money, some sort of trust or guardianship arrangement should be devised. But to give one spouse, from a marital estate of about a third of a million dollars, a few

trifling assets and an income at the poverty level, is not equitable.

I would divide the property so that she receives at least half, and require her to pay her own medical bills. For my reasons for preferring property division * to alimony, and for considering the value of the services of a housewife as equal to that of a wage-earner, see dissent in *Haugeberg v. Haugeberg, supra.*

---

* Either by outright division or by giving her notes secured by a lien on specific property.